606

**ALCAN PACIFIC CO., Plaintiff,**

v.

**MAUK SEATTLE LUMBER CO.,
Defendant.**

Civ. No. F-32-62.

United States District Court
D. Alaska.

July 22, 1966.

Supplemental Findings of Fact
Nov. 4, 1966.

Charles E. Cole, Fairbanks, Alaska, and Roger G. Connor, Anchorage, Alaska, for plaintiff.

John F. Kovarik, of Casey & Pruzan, Seattle, Wash., and Mary Alice Miller, of Collins & Clasby, Fairbanks, Alaska, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PLUMMER, Chief Judge.

This action having been tried before the court without a jury, and the court having duly considered the evidence and being fully advised in the premises, makes and enters the following:

## FINDINGS OF FACT

1. Plaintiff is a corporation organized under the laws of the State of Alaska and at all times relevant hereto was and is doing business in the State of Alaska. Defendant is a corporation organized under the laws of the State of Washington.

2. On April 12, 1961, plaintiff was awarded a contract by the Corps of Engineers, United States of America, for the construction of certain family quarters at Fort Greely, Alaska, designated Contract No. DA-95-507-ENG-1544, hereinafter referred to as Contract 1544. The work was to be performed for a total sum of $1,964,503.00, and contemplated construction of eight (8) separate buildings and an addition to one building.

3. Defendant accepted and undertook to deliver to plaintiff substantially all of the lumber requirements for Contract 1544.

4. One item of the lumber requirements was Type II ⅜ inch grooved siding, 1,860 pieces, at a price of $6,249.60. Defendant, when it accepted the order for Type II plywood, was fully cognizant of the contract specifications pertaining thereto. The present controversy involves only Type II plywood siding and when used herein the word "plywood" refers to Type II plywood siding.

5. On May 26 or 27, 1961, 1,860 panels of plywood arrived at the job site. On July 1, 1961, after plaintiff had be-

gun installing the plywood, plaintiff was advised by a field memorandum from the project engineer that all exterior plywood that did not comply with contract specifications would have to be removed and replaced by exterior siding that did meet specifications. Plaintiff ignored the project engineer's field memo and continued to apply siding that did not meet specification requirements.

6. On July 3, 1961, plaintiff was advised in writing by the resident engineer that the exterior plywood was not acceptable; that all costs incurred by replacement of any and all plywood would be borne by plaintiff; and the fact that the siding would have to be replaced would not in any way allow plaintiff an extension of time on the contract.

7. Despite these warnings, plaintiff proceeded to apply siding to the buildings as follows:

Bldg. 846—July 1, 3, 5, 6, 7, 8, 10, 17 and 18.

Bldg. 847—July 1, 3, 5, 6, 7 and 8.

Bldg. 848—July 1, 3, 6, 7 and 10.

8. As a result of the defective plywood contained in this first shipment, a settlement was reached whereby defendant allowed plaintiff a credit of $2,000.00 to cover application and removal of the below grade plywood and for reloading and sorting the other material that was on hand. In addition, the defendant agreed to replace the 1300 defective panels with plywood meeting contract specifications.

9. On August 3, 1961, the second shipment of plywood containing 1,300 sheets arrived at the job site. The Corps of Engineers immediately notified plaintiff at Fort Greely, in writing, that it considered most of the second shipment defective. Arrangements were made to have the plywood graded by a representative of the plywood division of the Pittsburgh Testing Laboratory. This was accomplished on August 8 and 9, 1961.

10. Prior to the second shipment of plywood being graded, plaintiff had accepted and used 402 sheets. Of the remaining 898 sheets graded, 610 were rejected and 288 were accepted as passing specifications. Accordingly, this shipment contained a total of 690 usable sheets.

11. On August 23, 1961, the third shipment of plywood containing 610 sheets arrived at the job site. Of this number, 385 sheets were usable and 225 had to be rejected.

12. On September 23, 1961, the fourth shipment of plywood containing 225 sheets of usable plywood arrived at the job site and was used to close in Building 821 and the above-ground manholes.

13. The number of sheets of plywood required to close in the buildings were as follows:

| Building Number | Sheets per building | Sub-total |
|---|---|---|
| 846 | 150 | |
| 847 | 188 | 338 |
| 848 | 150 | 488 |
| 855 | 300 | 788 |
| 875 | 260 | 1048 |
| 876 | 260 | 1308 |
| 877 | 260 | 1568 |
| 821 | 254 | 1822 |
| | Total | 1822 |

14. The number of usable sheets of plywood on hand from time to time is reflected below as follows:

| Number of sheets per shipment | | Defective | Good | Sub-total of good sheets |
|---|---|---|---|---|
| 1st shipment — | 1860 | 1300 | 556 | 556 |
| 8–3–61 — | 1300 | 610 | 690 | 1246 |
| 8–23–61 — | 610 | 225 | 385 | 1631 |
| 9–23–61 — | 225 | — | 225 | 1856 |

15. The total number of sheets required to close in buildings 846, 847 and 848, totalled 488. From the latter part of May, 1961, there were 556 sheets of usable plywood on the job site.

16. The number of sheets of plywood required to close in buildings 846, 847, 848, 855 and 875 was 1,048. From August 3rd on there were 1,246 sheets of usable plywood on the job. The number of sheets of plywood required to close in all buildings, with the exception of building 821, was 1,568. From August 23, 1961, on there were 1,631 sheets of usable plywood on the job.

17. The buildings were closed in on approximately the following dates:

| Building Number | Date closed in |
| --- | --- |
| 848 | August 9 |
| 847 | August 30 |
| 846 | August 31 |
| 855 | September 5 |
| 877 | September 6 |
| 876 | September 9 |
| 875 | September 13 |
| 821 | October 7 |
| 856 | September 9. |

The evidence does not establish what delay, if any, lack of available suitable plywood may have caused plaintiff.

18. During the performance of Contract 1544 daily report sheets were kept for the purpose of keeping the home office informed as to how the job was progressing and what was taking place. Such reports were usually made at the end of the day and briefly covered the operations on the job. The job engineer would go around and observe what was taking place and put this type of information on the report. Such things as job hindrances or delays were noted in the daily report.

19. The daily report sheets were written by the job engineers who were more familiar with what was being done on the job than was Mr. Billimek. From June 13 to August 18, 1961, the daily report sheets were signed by Ted Thoresen. From August 22, 1961, to January 16, 1962, they were signed by Stanley Brust. These persons were not called as witnesses at the trial.

20. The daily report sheets kept by plaintiff's employees were made prior to litigation and contemporaneously with the performance of the contract. The trial of this case occurred during the latter part of April and the first part of May, 1965. Where there is a conflict between the testimony of witnesses and plaintiff's daily report sheets the court finds the report sheets reliable and trustworthy, and has resolved all conflicts in the evidence in accordance with the facts reflected in the daily report sheets.

21. Plaintiff's daily report sheets reflect that plywood was applied on the following days:

Building No.

846—June 26, 27 and 29, July 1, 3, 5, 6, 7, 8, 17 and 18.

847—July 1, 3, 5, 6, 7 and 8, August 2.

848—July 1, 3, 6, 7 and 10, August 2, 7 and 9.

855—July 25.

875—August 17, 25 and 29, September 6, 9, 11 and 13.

876—August 5, 15, 19 and 21, September 5, 6, 7, 8 and 9.

877—August 4, 5, 10, 11 and 14, September 5 and 6.

856—September 5 and 7 (not Type II plywood siding).

821—September 13, 28, 29 and 30, October 2, 3, 4 and 5.

22. Plaintiff's daily job reports reflect that plywood was removed and replaced on the following dates:

Building No.

846—August 25, 26, 28, 29 and 31.

847—August 25, 26, 28, 29 and 30.

848—August 5.

855—August 30 and 31, September 1, 2, 4 and 5.

875—August 26 and 28.

876—September 5.

877—September 4.

23. Before commencement of the work, Mr. Billimek prepared a work schedule which he intended to follow and which he intended to be followed by the subcontractors on the job. Although his schedule called for the application of siding to commence on June 1, 1961, this actually commenced on Building 846 on June 26th, and on Buildings 847 and 848 on July 1, 1961. Application of siding on the remaining buildings commenced at a later date.

24. Section 5 of the general conditions of the specifications of Contract 1544 required the contractor to prepare and submit to the contracting officer for approval a practicable construction or work schedule. Plaintiff in accordance therewith prepared such a schedule (Exhibit G), submitted the same for approval and it was approved by the Corps of Engineers on or about June 26, 1961.

25. Because of delays which Mr. Billimek described as usual or normal, the work on the job actually progressed more closely during the pertinent period according to the practicable schedule submitted by plaintiff and approved by the Corps of Engineers than to the one prepared by Mr. Billimek. This more fully appears from Exhibits A and B appended hereto and by reference incorporated herein.

26. Article 3 of plaintiff's subcontract with its mechanical subcontractor Whitney Brothers provided, among other things, that Whitney Brothers agreed to commence the work promptly as directed by the contractor and to prosecute the same energetically, expeditiously and in full cooperation with the contractor and other subcontractors, and to proceed with all of said work in full accord with the requirements of the general construction until fully completed and accepted.

27. By letter dated October 21, 1961, plaintiff forwarded Whitney Brothers a copy of the construction schedule for Contract 1544 which they were expected to follow pursuant to Article 3 of their subcontract. The construction schedule forwarded by plaintiff was the practicable one prepared by plaintiff and approved by the government. This was Whitney Brothers actual work schedule on the project.

28. From the beginning plaintiff's project was plagued by problems and delay caused by the excavation subcontractor, the catering subcontractor, the painting subcontractor, mechanical subcontractor, flooring subcontractor, material problems, and lack of detail information. These delays were in no way related to the plywood siding.

29. The progress of the work on Contract 1544 was subjected to other delays resulting from the following:

a. Changes, omissions and mistakes in the plans and specifications, and additional work ordered by the government.

b. A labor dispute between the Associated General Contractors and the labor unions of operating engineers, laborers, teamsters and cement finishers which necessitated the laying off of all cement finishers, teamsters, iron workers and operators on June 26 until July 18, 1961. This dispute occurred during the peak of the construction season and all utilidor work ceased 100%. It was actually a month before full working operations were restored on the job. Due to this delay, painting and taping work was carried over into winter which resulted in efficiency drops to around 50% with temporary heat and also resulted in hindrances to other crafts.

c. A record breaking rainfall during the year 1961 and a record cold breaking spell during that winter.

d. Numerous other delays as noted and described in plaintiff's daily report sheets.

e. The combination of the changes, additional work and delays seriously changed the conditions of plaintiff's contract with the government and the labor dispute and strike caused a major delay in the construction schedule.

30. As a result of some of the above described delays, the government granted

**610**

an extension of time for the completion of the project as follows:

| | | |
|---|---|---|
| a. | Labor dispute during the summer of 1961 | 22 days |
| b. | Abnormal rainfall, June, 1961 | 15 days |
| c. | Record low temperatures, December, 1961 | 10 days |
| d. | Strike during January, 1962 | 4 days |
| e. | Dispute on hardwood floors | 7 days |
| f. | Change orders in contract | 15 days |
| | Total justifiable days | 73 days |

The contract was completed within the time allowed by the government, and no liquidated damage penalty, set by the contract at $100.00 per day, was imposed.

31. Defendant delivered the plywood to close in Building 821 and the above-ground manholes on September 23, 1961. Some three weeks later the Resident Engineer by a letter dated October 17, 1961, first complained that plaintiff was behind schedule. In reply to this letter plaintiff informed the Resident Engineer of directives given to plaintiff's subcontractors and the action to be taken by plaintiff which it anticipated would get the job back on schedule.

32. Plaintiff's plan of work provided that the plywood on the second story be applied to the framing while it was lying on the deck in a horizontal position. Thereafter the wall sections were to be raised to a vertical position by the use of hydraulic jacks. This technique acceler-ated construction and was an economical method of erecting the second floor framing and siding. Buildings 846, 847 and 848 were constructed in this manner. By reason of the fact that the plywood siding supplied by defendant did not meet contract specifications, it became necessary for plaintiff to revise its plan of work by erecting the framing and thereafter applying the plywood siding by craftsmen working from scaffolding. As a result of this change in the plan of work the cost of applying a sheet of plywood siding was increased about three times.

33. There remained, at the time of this change of plans, approximately 1300 sheets of plywood siding to be applied. It required approximately 3 man hours per sheet to apply a sheet of plywood siding to the end of a building. This is the best comparison appearing in the record for placing siding on the side of a building. The cost to plaintiff to keep a workman on the job was approximately $10.00 per hour.

34. The court finds that the cost of applying the remaining 1300 sheets of plywood siding under the revised work plan was approximately and reasonably $39,000.00, computed as follows:

$10.00 per man hour per workman
3 man hours—$30.00 per sheet
1300 sheets x $30.00=$39,000.00.

35. Plaintiff's overall increased cost resulting from this revision in plans was approximately and reasonably two thirds of $39,000.00 or $26,000.00.

36. In addition, plaintiff necessarily incurred the following reasonable expense by reason of the fact that the plywood supplied by defendant did not meet contract specifications:

| | |
|---|---|
| Plane ticket for William G. Jones | 66.00 |
| Telephone call to George Hannaford in Hoquiam | 5.78 |
| Freight on second shipment | 922.06 |
| Handling second shipment of plywood for grader | 123.44 |
| | 1,117.28 |

37. Plaintiff withheld the sum of $10,000.00 from the payment of the entire lumber and plywood order in anticipation of back charges on a portion of the lumber, not plywood, which never materialized. This amount is due defendant plus a balance of $641.76 due, over credits granted plaintiff on lumber orders not involved in this cause.

38. Except as set forth hereinabove the court finds that the other claims asserted in the action by the respective parties have not been proved by a preponderance of the credible evidence and they are not entitled to recover thereon.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and the subject matter of this action under Title 28 U.S.C.A. § 1332.

■ 2. Defendant breached its contract to timely deliver to plaintiff Type II plywood siding meeting contract specifications, and further breached its subsequent agreements to make replacement shipments of Type II plywood siding meeting contract specifications.

3. As a result of such breach and breaches plaintiff was damaged in the following particulars and should be given judgment against defendant for the following amounts:

|  |  |
|---|---|
| (a) For additional costs and expenses incurred by plaintiff by being required to change its work plan with reference to framing and the application of Type II siding | $26,000.00 |
| (b) Plane ticket for William G. Jones | 66.00 |
| (c) Telephone call to George Hannaford in Hoquiam | 5.78 |
| (d) Freight on second shipment | 922.06 |
| (e) Handling second shipment of plywood for grader | 123.44 |
| Total | $27,117.28 |

■ 4. Plaintiff is the prevailing party and as such is entitled to recover its costs to be taxed by the Clerk and an attorney's fee in the sum of $2,500.00, which amount is hereby adjudged by the court to be reasonable.

5. All other claims asserted by plaintiff in this action have not been proved by a preponderance of the credible evidence and plaintiff is not entitled to recover except as provided in paragraphs 3 and 4 hereinabove.

6. Defendant is entitled to recover on its cross or counterclaim as follows:

|  |  |
|---|---|
| (a) Amount withheld on lumber order by plaintiff | $10,000.00 |
| (b) Balance due on lumber order | 641.76 |
| Total | $10,641.76 |

7. The amount recovered by defendant on its cross or counterclaim shall be set off or deducted from the judgment awarded plaintiff.

8. Within fifteen (15) days counsel for plaintiff shall prepare, serve and submit a form of judgment for approval by the court and for entry by the Clerk.

APPENDIX

EXHIBIT A

EXHIBIT B

| BUILDING | 1931 | MAY | JUNE | JULY | AUG. | SEPT. | OCT. |
|---|---|---|---|---|---|---|---|
| 655/657-G | | | 16 | | 31 | 5 | |
| 673/675-G | | | 15 | | | | |
| 679/676-G | | | 7 | 30 | | | |
| 849/877-G | | | 8 | 9 | | | |
| 875/873-G | | | | 15 | 11 | | |
| 876/892-G | | | | 19 | 9 | | |
| 877/878-G | | | | 11 | 24 | 6 | |
| 856 | | | | 19 | | 7 | |
| 821/855-G | | | | | | | 5 |

Billamek Sched.

GOV'T. SCHED.

BUILDING ENCLOSURE

## ORDER SUPPLEMENTING FINDINGS OF FACT

The Findings of Fact filed July 22, 1966, are hereby supplemented by adding thereto paragraph 34–A, as follows:

34–A. The computation of three man hours—$30.00 per sheet, includes all steps or procedures necessary to install or apply a sheet of plywood, including but not being limited to the following:

1. A teamster to drive a truck to and from the stock pile of plywood to the location on the job site where the plywood was to be applied.

2. Laborers to move the plywood from the stock pile; load the plywood on the truck; unload the plywood from the truck; and place or move the plywood into position where it could be handled by carpenters.

3. The application or installation of the plywood sheets to the building frame by the carpenters.

4. This would include the cutting or sawing of plywood sheets into half where necessary and the cutting and sawing where necessary and installing plywood in areas where windows and doorways were located.

It is hereby ordered that the Findings of Fact filed July 22, 1966, shall be considered as having been supplemented without rewriting or refiling the same.